# EXHIBIT 2

## Affidavit of NATHAN STRONGE (with "agreements" appended thereto)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM GROSS,<br><br>    Plaintiff,<br><br>v.<br><br>RUSH HOUR EVENTS, LLC, f/k/a RUSH HOUR MARKETING, LLC; ROBERT E. HOVEY, JR., individually and as member of RUSH HOUR EVENTS, LLC; JAMES F. DAVIS, II, individually and as member of RUSH HOUR EVENTS, LLC; DAVID BOTNER, individually and as member of RUSH HOUR EVENTS, LLC; and ROBERT MONCADA, individually and as member of RUSH HOUR EVENTS, LLC,<br><br>    Defendants | No. 08 CV 3686 |

## AFFIDAVIT OF NATHAN STRONGE

NATHAN STRONGE, being sworn on oath, does hereby state and depose as follows:

1. I am a person of mature years and sound mind, and am a resident of the State of Illinois. I have personal knowledge of the facts set forth in this Affidavit, and if sworn to testify, I could competently do so as to the basis for these attestations.

2. I was previously employed as a full-time salesman at RUSH HOUR EVENTS, LLC ("RUSH HOUR") in Chicago, Illinois. I was hired in February of 2006, and worked there continuously until late December of 2007, at the same location where the plaintiff WILLIAM GROSS was employed. My job at RUSH HOUR – telephone salesman – was the same job WILLIAM GROSS had.

3. During the time that I was employed by RUSH HOUR, the employees (myself included) had to be in the office by 9:00 a.m. each day. We worked Monday to Friday, 9:00 a.m. to 5:00 p.m., with no deviations. No one, to my knowledge, was ever allowed to work out of their

home, or at any other location than the office.

4. The employees of RUSH HOUR (myself included) were not permitted to sell our personal services to the general public. We did our training on company time. We were required to perform our tasks in a certain order, pursuant to specific rules and procedures. We could not assign our responsibilities to anyone else, or make any changes in the procedures which our employers dictated to us.

5. Our supervisors (chiefly including ROBERT HOVEY and JAMES DAVIS) placed many additional requirements upon the staff at RUSH HOUR. We were required to participate in prayers, two times each day. Attendance was mandatory. HOVEY and DAVIS dictated the prayers that all of us had to recite. No one was allowed to sit it out, or to make any changes in the prayers, or in the religious affiliation which HOVEY and DAVIS imposed upon the rest of us.

6. After each prayer (morning and afternoon), there was a lengthy meeting that everyone had to attend. Lunch was scheduled from twelve to one, and those of us who smoked could only do so at specific times during each day. Deviation from the schedule was not permitted.

7. I was never an independent contractor for RUSH HOUR, in any sense of the word. I was economically dependent upon the owners of RUSH HOUR and under their control at all times. Insofar as I was able to observe what the other salesmen were doing, this held true for the other salesmen as well.

8. During the course of my employment, I was called into my supervisor JAMES DAVIS's office and handed two "agreements." ROBERT HOVEY was also present. DAVIS and HOVEY informed me, in no uncertain terms, that I had to sign the agreements or else lose my job.

9. While seated in my supervisor's office, I read through the "agreements." I noticed that in both "agreements," there were numerous statements which were completely false, such as

(i) that I was an "independent contractor;" (ii) that I "do not perform tasks in a specified order;" (iii) that I "provide directions about how the work is to be done;" (iii) that my services "are not integrated into the business operations of Rush Hour;" (iv) that my work can be done at home; (v) that I can "make [my] services available to the general public," among others.

10. After I finished reading the "agreements," HOVEY and DAVIS repeated their demand that if I did not sign the agreements, I would lose my job.

11. Since I did not want to lose my job, I signed the "agreements" that my employers demanded be signed. After signing those documents, the nature and conditions of my employment at RUSH HOUR remained exactly the same as before – with no degree whatsoever of any autonomy or self-direction, no right to sell my personal services to the general public, no right to do my work outside of the office, no right to change or modify the rules and procedures which my employers dictated, and no independence.

12. Copies of the aforesaid "agreements," which my supervisors demanded that I sign, are attached hereto as Exhibits "A" and "B."

FURTHER AFFIANT SAYS NOT.

_____
NATHAN STRONGE

Signed and Sworn to before me this 30 day of August, 2008.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
THEODORA I. KRAUSE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 03/26/09

# EMPLOYMENT, CONFIDENTIALITY, NONSOLICITATION and NONCOMPETE AGREEMENT

STATE OF ILLINOIS

COOK COUNTY

BE IT KNOWN, that on the ___ day of _____, 2006, effective immediately,

BEFORE ME, the undersigned Notary Public duly commissioned and qualified in and for the State aforesaid, and in the presence of the undersigned competent witnesses,

PERSONALLY CAME AND APPEARED:

RUSH HOUR MARKETING, LLC., a corporation organized under the laws of the State of Illinois, having its business mailing address at 101 North Wacker Drive, Suite 2005, Chicago, IL 60606, herein appearing by and through Robert E. Hovey, Jr. and/or James F. Davis II, owners (title), duly authorized (hereinafter referred to as "RUSH HOUR"):

and

_____, a limited liability company/corporation organized
(company)
under the laws of the State of Illinois, having its principal business address at
_____, herein
(company address)
appearing by and through its duly authorized agent/representative, _____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(individual)

and

_____, a person of the full age of majority whose address is:
(individual)
_____ (hereinafter
(address)
collectively referred to as "**Contractor**").

who declared that they do by these presents enter into the following agreements:

## EMPLOYMENT AGREEMENT

### RECITALS

WHEREAS, RUSH HOUR has established, owns and operates a business which is operating throughout the United States of America under the corporate name of RUSH Marketing, LLC., which is a marketing company for automobile dealerships;

EXHIBIT A

1. *Duties.* Upon the effective date as recited herein, RUSH HOUR retains **Contractor** as a salesperson and to perform the operation of such projects in the business which may occur on a day to day basis (subject always to the direction and control of the officers and Board of Directors of Rush Hour) and under the terms and conditions herein set out **Contractor** hereby accepts such an arrangement.

1. *Term.* The employment shall commence effective the date hereinafter set forth. There is no continuing relationship between the parties. It shall terminate upon either party giving a one day written notice, or if **Contractor** is actively or imminently engaged in a "sales event", one day notice following termination of the sales event. **Contractor** further acknowledges that Rush Hour may cancel this contract at any time for any reason including non-performance of work, and/ or poor or deficient service, however, no reason need be stated for termination;

2. *Compensation.* As compensation in full for his services hereunder, Rush Hour shall pay **Contractor** as follows:

    He shall receive such rate of compensation as is fixed by Rush Hour and **Contractor** by a separate schedule. **Contractor** accepts such sum as his fee.

3. **Contractor** acknowledges that he is an independent contractor, that he is not an employee and that he will pay and report all necessary taxes associated with said fees, realizing that no funds are being withheld from his fees for the payment of any taxes. As an independent contractor, **Contractor** acknowledges that he will not recover any fringe benefits nor any insurance from RUSH HOUR. The amount as set forth above is his total fee. He shall pay all expenses incurred, including providing his own transportation, paying for his own gasoline, repairing his own vehicle, automobile and transportation insurance and his own taxes.

    a.    Contractor also acknowledges that he is an Independent Contractor and as such is not eligible to receive any unemployment insurance benefits from Rush Hour in the event of termination of his agreement;

4.    *Extent and place of services.*    It is acknowledged that **Contractor** is a salesperson whose abilities would benefit RUSH HOUR. **Contractor** shall devote such time, attention, and energies to the job and the business of RUSH HOUR as necessary to professionally and timely complete each job and to operate a successful automobile marketing business.

    a.    **Contractor** stipulates that he provides directions about how the work is to be done and that Rush Hour only hires for the work to be done;

    b.    While quality of work is to be rendered, **Contractor** acknowledges that quality of work is different than providing directions about the work;

    c.    **Contractor** does all of his own training in his own time;

    d.    **Contractor's** acknowledges that his services are not integrated into the business operations of Rush Hour as a whole, but are done per diem only;

    e.    **Contractor** acknowledges that services are not rendered personally, but are contracted out by **Contractor** as a business entity;

    f.    The work is performed on the premises of Rush Hour or such other place (ie. Car dealerships) where Rush Hour is doing business and for which **Contractor's** services are employed, but work can also be done at **Contractor's** home or such other location as **Contractor** is able to conduct business;

    g.    **Contractor** does not perform tasks in a specified order, but rather performs such tasks in the order necessary for the work to be done to complete the work defined by its nature;

    h.    Oral reports or written reports may be submitted, but are not generally necessary, subject to the direction of Rush Hour. Any reports are and become a part of the finished product;

    i.    **Contractor** does invest in the facilities used by **Contractor** whether at home or at such other location as **Contractor** is able to conduct business;

    j.    **Contractor** assumes the risk of loss if his project or assigned tasks are not completed on time or if completed incorrectly;

    k.    **Contractor** may and does make his services available to the general public without permission of Rush Hour, subject always to the Non-Solicitation and Non-Competition agreements made a part of this Employment Contract and incorporated by reference herein;

5.    **Contractor** agrees to faithfully perform the assigned duties and jobs to the best of his ability and to devote such time as necessary to the transaction of RUSH HOUR's business.

6.    **Contractor** agrees to promptly, completely, and accurately report his work and expenses to RUSH HOUR, to promptly direct all payments to RUSH HOUR by its customers for work performed by him for RUSH HOUR.

7.    **Contractor** can control how he performs any and all jobs to which he is assigned including the right to substitute others to do the job.

8.    **Contractor** acknowledges that he is a salesman with years of experience and with significant skills. He further agrees to work diligently to complete each job timely in a manner to be determined by him. He further acknowledges that he has no set hours to be at the business. He shall determine same, *subject always* to the direction and approval of RUSH HOUR as jobs and projects arise;

9. *Effective date.* The effective date of this agreement is the ___ day of _____, 2006.

10. *Assignment.* This Agreement shall inure to the benefit of and be binding upon the RUSH HOUR, its successors and assigns.

11. RUSH HOUR may engage independently or with others in other business ventures of every nature and description including without limitation the ownership, operation, management, syndication and development of the marketing of automobiles for automobile dealers throughout the United States; **Contractor** shall not have any rights in and to such independent ventures or to income or profits derived therefrom.

12. **Contractor** may engage, directly or indirectly, in any other business but he may not engage in any other business ventures which compete with RUSH HOUR.

13. **Contractor** is **not** authorized to execute, sign, seal and deliver in the name and on behalf of RUSH HOUR any agreements, contracts, documents, certifications, and instruments whatsoever including the employment of persons, unless such authority be expressly granted unto him by RUSH HOUR.

## CONFIDENTIALITY AGREEMENT

### RECITALS

WHEREAS, RUSH HOUR is engaged in the business of marketing automobile dealerships throughout the United States;

WHEREAS, in the course of performing his duties with RUSH HOUR,

_____ and _____ ("Contractor") will
(Company)                    (Individual)

Page 5 of 16

become knowledgeable with respect to certain information regarding RUSH HOUR's business operations, including but not limited to lists of RUSH HOUR customers and information regarding its existing and potential customers, including, but not limited to, customers orders, information on pricing and profitability, financial information, sales and marketing strategies, service techniques and other proprietary information relating to the conduct of RUSH HOURS's business which if revealed to third parties, RUSH HOUR's competitors, or if it is used by **Contractor** to compete with Rush Hour would cause RUSH HOUR to suffer irreparable harm and damage RUSH HOUR's business relationship:

## AGREEMENT

RUSH HOUR and **Contractor** agree to the following confidentiality provisions as a term and condition of its business dealings with RUSH HOUR:

1. **Contractor** acknowledges that by reason of doing business with RUSH HOUR, he will have access to confidential and proprietary information regarding RUSH HOUR, its business operations and customers including, but not limited to, lists of RUSH HOUR customers and sensitive information regarding its existing and potential customers, including but not limited to, customer orders, information on pricing and profitability, financial information, sales and marketing strategies, service techniques and other proprietary information relating to the conduct of RUSH HOUR's business as well as any other information regarding RUSH HOUR's business that is not known to the general public. (hereinafter "Confidential Information").

2. **Contractor** agrees to take all reasonable measures required to maintain the security of RUSH HOUR's Confidential Information and agrees that he will use such information exclusively for the benefit of RUSH HOUR and not for the benefit of himself or anyone else.

3.  Contractor also agrees to return all documents, lists, records, manuals, computer files or other repositories of RUSH HOUR's Confidential Information to RUSH HOUR upon termination of his relationship with RUSH HOUR or at the request of RUSH HOUR.

4.  Contractor hereby agrees that he will not disclose to anyone RUSH HOUR's Confidential Information, including, but not limited to any and all information regarding the business operations and customers of RUSH HOUR which he acquires knowledge of during his employment by RUSH HOUR.

5.  Contractor will not at any time, both during and after his employment with RUSH HOUR, disclose to any person, firm, corporation or other entity or use for Contractor's own personal benefit or that of any other person, firm, corporation, or other entity, any information regarding RUSH HOUR, its customers and its or their business operations except solely to the extent necessary to perform services on behalf of RUSH HOUR during the course of his employment with RUSH HOUR.

4.  Contractor acknowledges and agrees that any breach of this agreement may cause irreparable harm not compensable through monetary damages alone and that RUSH HOUR may seek and obtain a temporary restraining order, preliminary and/or permanent injunction from a court requiring Contractor to abide by the terms of his agreement. In addition to the recovery of any monetary damages caused by such breach, Contractor agrees to pay the litigation costs, including reasonable attorney fees incurred by RUSH HOUR in enforcing this agreement with Contractor.

## NONSOLICITATION AGREEMENT

### RECITALS

Page 7 of 16

WHEREAS, in the performance of his duties, Contractor has access to certain of RUSH HOUR's proprietary prospect, client and customer lists, its sales, marketing and promotional strategies and plans and other confidential and proprietary business information.

WHEREAS, Contractor would not have access to or knowledge of this Confidential Information but for his employment with RUSH HOUR.

## AGREEMENT

In an effort to reasonably and legitimately protect RUSH HOUR's ingenuity and confidential and proprietary business plans, client and customers lists and marketing plans and prospects, the parties, intending to be legally bound, agree as follows:

1. Contractor acknowledges that he occupies a position of trust and confidence and of necessity has access to and the use of confidential and proprietary sales and marketing information, client, customer and prospect lists and sales and marketing strategies developed by RUSH HOUR in connection with its and its clients' and customers' business plans and programs.

2. Contractor further acknowledges that: (a) RUSH HOUR's business is national in scope; (b) its client's products and RUSH HOUR's services are sold, delivered and offered throughout the United States; (c) RUSH HOUR has and will compete with other businesses that are or could be located in any part of the United States; (d) RUSH HOUR has required that Contractor make the covenants set forth in this agreement as a condition of employment and prior to disclosure of necessary confidential and proprietary information to Contractor; (e) the provisions of this agreement are reasonable and necessary to protect and preserve RUSH HOUR's legitimate business interests; and (f) RUSH HOUR would be irreparably damaged if Contractor were to breach the covenants set forth in this agreement.

3.  As an inducement for RUSH HOUR to employ Contractor and in consideration of the disclosure of confidential and proprietary RUSH HOUR information, Contractor agrees that:

While employed by RUSH HOUR and for a period of two (2) years following the termination of employment:

a.  Contractor will not, directly or indirectly, either for himself or any other individual, corporation, partnership, limited liability company or other entity ("Persons"), solicit the business of any person known to have been a client or customer of RUSH HOUR during the period of Contractor's employment by RUSH HOUR, whether or not Contractor had any personal contact with such person, with respect to services, products or activities of RUSH HOUR.

b.  Contractor shall not be prevented from calling on any person known to have been a customer of RUSH HOUR during the period of Contractor's employment, provided that Contractor does not solicit business of the same type known to have been performed by RUSH HOUR.

c.  Contractor will not, directly or indirectly, either for himself or for any other persons: (A) induce or attempt to induce any person who is or was employed by RUSH HOUR during the period of Contractor's employment by RUSH HOUR to leave the employ of RUSH HOUR, (B) in any way interfere with the relationship between RUSH HOUR and any person who is or was employed by RUSH HOUR during the period of Contractor's employment by RUSH HOUR, (c) employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was employed by RUSH HOUR during the period of Contractor's employment by

Page 9 of 16

RUSH HOUR, provided such person was an employee of RUSH HOUR (or of any affiliate of RUSH HOUR that may hereafter employ such person) in the 12-month period immediately prior to offering such employment or engagement, or (D) induce or attempt to induce any person who is or was a customer, supplier, licensee, client or business relation of RUSH HOUR to cease doing business with RUSH HOUR, or in any way interfere with the relationship between such person and RUSH HOUR.

4. In the event of any breach by **Contractor** of any covenant set forth in this agreement, the term of such covenant will be extended by the period of the duration of such breach.

5. If **Contractor** breaches the covenants set forth in this agreement, RUSH HOUR will be entitled to the following remedies:

    (a) To obtain damages from **Contractor**; and

    (b) In addition to its right to damages and any other rights it may have, to obtain injunctive or other equitable relief to restrain any such breach or threatened breach or otherwise to specifically enforce the provisions of this agreement, it being agreed that money damages alone would be an inadequate remedy for such breach.

The rights and remedies of the parties to this agreement are cumulative and alternative.

6. This agreement will be binding upon **Contractor** and all others acting in concert with **Contractor** and will inure to the benefit of RUSH HOUR and its affiliates, successors and assigns.

## NON-COMPETE CLAUSE

In further consideration of the execution of this Agreement, **Contractor** agrees that he will not during the continuance of this contract and for a period of two (2) years following termination of his employment, so long as the company carries on a like business:

A. Contact the customers of RUSH HOUR, the vendors, or the clients, as set forth in this agreement, in an effort to solicit or otherwise assist anyone either directly or indirectly as an individual, partner, stockholder, director, officer, clerk, principal, agent, employee, independent contractor, consultant or any other relationship whatsoever to engage in a business similar to the company, or with customers of the company, solicit or otherwise assist anyone either directly or indirectly as an individual, partner, stockholder, director, officer, clerk, principal, agent, employee, independent contractor, consultant, or any other relationship whatsoever in contacting any of the clients disclosed by the company to do a similar type business.

B. Contractor further agrees that on the termination for any cause of employment with employer, and for a period of two (2) years thereafter, he will not, directly or indirectly, as an individual, partner, stockholder, director, officer, clerk, principal, agent, employee, independent contractor, consultant, or any other relationship whatsoever engage in the same or similar line of business now carried on by RUSH HOUR, or engage to work for any individual, firm or corporation engaged in that line or similar line of business, in the territory outlined hereinafter. This covenant not to compete will be considered null and void only if RUSH HOUR informs Contractor that the termination of Contractor's employment is due to a decline in the business of RUSH HOUR which limits the amount of work to be performed for RUSH HOUR when the Contractor is totally free from fault in bringing about the termination of the employment relationship;

This covenant not to compete shall be effective only in the restricted area, which restricted area is delineated as follows:

**In the State of Arkansas**: Washington County, Miller County;

**In the State of California**: Sacramento County, Los Angeles County;

**In the State of Connecticut**: Litchfield County;

**In the State of Georgia**: Gwinnett County, Cobb County, Clayton County, Bibb County, DeKalb County, Wayne County, Mitchell County, Houston County, Ware County, Tift County, Fulton County, McDuffie County, Chatham County, Bryan County, Effingham County;

**In the State of Florida**: Duval County/City of Jacksonville, St. Johns County, Columbia County, Leon County, Escambia County;

**In the State of Iowa**: Clay County, Black Hawk County, Johnson County, Dubuque County, Des Moines County, Linn County;

**In the State of Idaho**: Bonneville County;

**In the State of Illinois**: Cook County, De Witt County, DeKalb County, Montgomery County, McHenry County, Lake County, Will County, Grundy County;

**In the State of Indiana**: Ripley County, Franklin County, Allen County, Fayette County, Monroe County, Howard County, Decatur County;

**In the State of Kansas**: Unified Govt. of Wyandotte County/K.C.;

**In the State of Kentucky**: Pike County;

**In the State of Louisiana**: Lincoln Parish, St. John The Baptist Parish, Jefferson Parish, Tangipahoa Parish, St. Tammany Parish, Concordia Parish, Plaquemines Parish, Orleans Parish, St. Charles Parish, Ascension Parish, East Baton Rouge Parish, Evangeline Parish, Iberia Parish, Iberville Parish, Lafourche Parish, St. Charles Parish, St. James Parish, St. Martin Parish, Terrebonne Parish, West Baton Rouge Parish, Calcasieu Parish, Ouachita Parish;

**In the State of Massachusetts**: Bristol County, Plymouth County, Essex County, Franklin County;

**In the State of Michigan**: Delta County, Lenawee County, Clare County, Lenawee County, Ingham County, Cheboygan County, Van Buren County, Washtenaw County, Muskegon County, Hillsdale County;

**In the State of Virginia:** Culpeper County, City Of Manassas, City Of Manassas Park, Prince William County, Montgomery County, Washington County, Campbell County, City Of Lynchburg;

**In the State of Vermont:** Chittenden County;

**In the State of Washington:** Kitsap County, King County, Spokane County, Thurston County, Snohomish County;

**In the State of Wisconsin:** Waupaca County, La Crosse County, Dunn County, Dane County, Fond du Lac County, Door County, Sheboygan County, Oneida County, Marathon County, Brown County, Walworth County, Milwaukee County, Wood County, Racine County;

**In the State of West Virginia:** Tyler County, Wetzel County

**In the State of Wyoming:** Campbell County, Laramie County.

A violation of this covenant not to compete shall entitle RUSH HOUR to recover damages for the loss sustained and the profit of which it has been deprived. In addition, upon proof of the failure to perform by **Contractor** without the necessity of proving irreparable injury, a court of competent jurisdiction shall order injunctive relief enforcing the terms of this Agreement.

## GENERAL PROVISIONS

Neither the failure nor any delay by the party in exercising any right, power, or privilege under this agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

To the maximum extent permitted by applicable law, (a) no claim or right arising out of this agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice or demand

Page 14 of 16

on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to principles of conflicts of law thereof.

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this agreement may be brought against any of the parties in the Courts of the State of Illinois, County of Cook, or, if it has or can acquire jurisdiction, in the United States District Court for the State of Illinois and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the proceeding sentence may be served on any party anywhere in the world.

Whenever possible, each provision and term of this agreement will be interpreted in a manner to be effective and valid, but if any provision or term of this agreement is held to be prohibited or invalid, then such provision or term will be ineffective only to the extent of such prohibition or validity, without invalidating or affecting in any manner whatsoever the remainder of such provision or term or the remaining provisions or terms of this agreement. If any of the covenants set forth in this agreement are held to be not reasonable and necessary to RUSH HOUR for the protection of its legitimate interest in the enjoyment of its developed business, to impose an unreasonable burden on Contractor, to be against public policy or to be otherwise unreasonable, such covenants will be considered subject to reform by a court of competent jurisdiction to conform its terms to the reasonable intent of the parties with respect to scope, time, and geographic area, will be effective, binding and enforceable against Contractor.

Any modification of this agreement or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in writing signed by each party or an authorized representative of each party.

Any notice provided for or concerning this agreement shall be in writing and be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this agreement.

THUS DONE AND SIGNED in my notarial office on the day, month, and year hereinabove written in the presence of the undersigned competent witnesses and me, Notary.

RUSH HOUR MARKETING, LLC.

BY: _____
Robert E. Hovey, Jr. or James F. Davis II, as
owners of Rush Hour Marketing, LLC

SIGNATURE _____

PRINTED NAME (individual) _____

WITNESS _____

WITNESS _____

NOTARY PUBLIC _____

Page 16 of 16



## Independent Contractor Agreement

Name_____

SSN or Tax ID No._____

Phone Number_____

Address_____

City, State, Zip_____

Start Date_____

I agree to be contracted for work by Rush Hour Marketing, LLC located in Chicago, IL. I understand that my duties will include providing the service of selling "Super Sales" via telemarketing and providing continuous sales support throughout the entire "event" process in exchange for an agreed upon commission amount. (See Below). If I voluntarily or involuntarily terminate this agreement without a two week advance notice, this will prevent my ability to fulfill my obligations for which I have been contracted by Rush Hour and therefore, no commissions will be payable. I understand that as a sole proprietor working as an independent contractor that I am responsible for paying my own taxes and providing my own insurance and agree to hold Rush Hour Marketing, LLC harmless.

**Commission Schedule** (payable on Fridays for completed deals)

New Business_____%

Resigns_____%

Contractor Signature_____  Date_____

Rush Hour Management_____  Date_____



EXHIBIT B